MARINER FINANCIAL GROUP, INC.
and Joe F. Moore, Jr., Petitioners,

v.

H.G. BOSSLEY and Carole P.
Bossley, Respondents.

No. 00–0325.

Supreme Court of Texas.

Argued Feb. 7, 2001.

Decided June 13, 2002.

Norman T. Reynolds, Jackson Walker, James M. McGraw, Looper Reed Mark & McGraw, Houston, for Petitioner.

Jim Luis Garcia, Don K. Leufven, Alonso, Cersonsky, Leuven & Suarez, Houston, for Respondent.

Justice O'NEILL issued the opinion of the Court, in which Justice ENOCH, Justice BAKER, Justice HANKINSON, and Justice RODRIGUEZ joined.

H.G. and Carole Bossley sued to vacate an arbitration award in favor of Mariner Financial Corp. and Joe Moore, Jr. The Bossleys complained that the arbitration panel's chair was evidently partial because he did not disclose an adverse relationship

with one of the Bossleys' expert witnesses. The trial court rendered summary judgment for Mariner and Moore confirming the award, but the court of appeals reversed, holding that the arbitrator had a duty to discover and disclose the relationship. 11 S.W.3d 349. We conclude that summary judgment was improper because Mariner and Moore failed to establish as a matter of law that the arbitrator was not evidently partial. Accordingly, we affirm the court of appeals' judgment.

## I

Mariner Financial Corp. and Joe Moore, Jr., managed the Bossleys' retirement account. After the account incurred substantial losses, the Bossleys sued Mariner and Moore for fraud and self-dealing. By agreement, the parties arbitrated the dispute under the National Association of Securities Dealers (NASD) Code of Arbitration,[1] which the parties' agreement incorporated. The Code provided that a NASD administrator would select a three-arbitrator panel and designate one arbitrator as the panel chair. The Code also imposed the following duties on the arbitrators:

(a) Each arbitrator shall be required to disclose to the Director of Arbitration any circumstances which might preclude such arbitrator from rendering an objective and impartial determination. Each arbitrator shall disclose:

(1) Any direct or indirect financial or personal interest in the outcome of the arbitration;

(2) Any existing or past financial, business, professional, family, or social relationships that are likely

to affect impartiality or might reasonably create an appearance of partiality or bias. Persons requested to serve as arbitrators should disclose any such relationships that they personally have with any party or its counsel, or with any individual whom they have been told will be a witness. They should also disclose any such relationship involving members of their families or their current employers, partners, or business associates.

(b) Persons who are requested to accept appointment as arbitrators should make a reasonable effort to inform themselves of any interests or relationships described in paragraph (a) above.

NASD CODE OF ARBITRATION PROCEDURE § 10312(a)-(b).

The NASD administrator selected A. Bentley Nettles as the panel chair. The administrator then forwarded each party's witness list to the panel members, asking them to review the names and report any potential conflicts. Nettles reported that he had a social relationship with one of the Bossleys' witnesses, but no one objected. More important to this case, the Bossleys' witness list also included Laila M. Asmar as an expert witness. Nettles did not report any conflict with Asmar. The arbitration proceeded, and the panel ultimately decided the case in Mariner and Moore's favor.

About two months later, Asmar was reviewing files at her office when she found a deposition she had given as an expert witness in a malpractice action against Net-

---

1.  The National Association of Securities Dealers, Inc., is now known as NASD Regulation, Inc., and the Code is now known as the NASDR Code of Arbitration Procedure. The Bossleys' agreement to submit to NASD arbitration was signed on November 16, 1995, and references to the NASD Code of Arbitration Procedure are to its contents on that date.

tles almost two and a half years before the arbitration. In that deposition, Asmar testified that Nettles committed malpractice in seven different ways. The suit was eventually settled, and the settlement documents were sealed. After discovering the transcript, Asmar immediately notified the Bossleys, who then petitioned to vacate the arbitration award against them. By affidavit, Asmar averred that she did not remember Nettles until she discovered the deposition transcript after the arbitration.

The Bossleys contended that Nettles's prior relationship with Asmar rendered him evidently partial, which is grounds for vacating an arbitration award under both federal and state law. 9 U.S.C. § 10(a)(2); TEX. CIV. PRAC. & REM.CODE § 171.088(a)(2)(A). Mariner and Moore responded by moving for summary judgment, seeking confirmation of the award and denial of the Bossleys' petition. The motion alleged that the Bossleys either had no legal basis for vacating the award or, alternatively, had waived any complaint by failing to object to Nettles's partiality until after the award. Hoping to bolster their claim that Nettles was partial, the Bossleys also filed a motion to compel production of the sealed settlement documents from Nettles's malpractice case.

The trial court denied the Bossleys' discovery motion and granted summary judgment for Mariner and Moore. The court of appeals reversed, holding that the pre-existing relationship between Nettles and Asmar, coupled with Nettles's failure to disclose it, raised a fact issue about Nettles's evident partiality. 11 S.W.3d at 352. The court further concluded that Mariner and Moore had not established as a matter of law that the Bossleys waived the right to now object to Nettles's selection by failing to object before the panel convened. *Id.* Finally, the court of appeals concluded that the settlement documents had no bearing on the evident partiality issue, and declined to rule on the Bossleys' discovery motion. *Id.*

## II

■ Mariner and Moore argue that the court of appeals erred in reversing the trial court's summary judgment because there is no evidence that Nettles remembered or reasonably should have recalled Asmar when the arbitration occurred and thus no basis to infer that the relationship influenced his decision. However, Mariner and Moore did not file a no-evidence summary judgment motion. *See* TEX.R. CIV. P. 166a(i). To prevail on their motion under Rule 166a(c), Mariner and Moore had to establish that Nettles was not evidently partial as a matter of law. *See* TEX.R. CIV. P. 166a(c). The Bossleys contend that Mariner and Moore did not and could not meet this burden because both this Court's decision in *Burlington Northern Railroad Co. v. TUCO, Inc.,* 960 S.W.2d 629 (Tex. 1997), and the arbitration agreement itself obligated Nettles to disclose his relationship with Asmar.

In *TUCO*, an arbitration panel's neutral arbitrator accepted a business referral from a partisan arbitrator's law firm during the arbitration. *Id.* at 631. There was no dispute that the neutral arbitrator knew about the relationship; the only question was whether failure to disclose the relationship could establish evident partiality. *Id.* at 631–32. We determined that it could because "a neutral arbitrator ... exhibits evident partiality ... if the arbitrator does not disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality." *Id.* at 630. Under this objective test, the consequences for nondisclosure are directly tied to the materiality of the unrevealed information. *See id.* at 637 (stating a "neutral arbitrator need not disclose re-

lationships or connections that are trivial."). The relationship in *TUCO* arose from a lucrative business referral to one of the arbitrators and thus was not trivial. *Id.* The undisclosed relationship was obviously known to the arbitrator, and we concluded that his failure to disclose the referral was a material fact that objectively created a reasonable impression of his partiality. *Id.*

The summary judgment record here, however, is silent about whether Nettles remembered Asmar or ever knew of her. Without some evidence of this, we cannot determine whether the undisclosed relationship is material to the issue of evident partiality. Clearly, the relationship could not have influenced Nettles's partiality if, in fact, he was unaware of it during the arbitration. Thus, the state of Nettles's knowledge about Asmar is a fact issue material to determining his partiality.

■ As an alternative ground, Mariner and Moore argue that the Bossleys waived any complaint about Nettles's partiality by not objecting to his participation before submission. But from the summary judgment evidence, we know that the Bossleys did not learn about the relationship between Asmar and Nettles until after the arbitration. Asmar did not reveal the relationship because she did not remember Nettles until two months after the arbitration, and even then only made the connection after discovering the deposition transcript while preparing to move offices. In her affidavit, Asmar explained that Nettles did not attend her deposition, and that she never met or saw Nettles before the arbitration. Asmar also testified that she had no further involvement with the malpractice case against Nettles after that deposition. We therefore agree with the court of appeals that the Bossleys could not waive an objection that is based on a prior ad-

verse relationship between Nettles and Asmar that they knew nothing about.

Finally, Mariner and Moore argue that the Bossleys themselves had a duty to discover the relationship between Nettles and Asmar. But whether or not the Bossleys had such a duty, which we do not decide, we note that Mariner and Moore have not established that the Bossleys could have discovered the relationship any sooner than they did through a reasonable investigation. Summary judgment is therefore not appropriate on that basis.

### III

The concurring justices suggest that it does not matter whether Nettles remembered Asmar because an arbitrator's failure to disclose an adverse relationship cannot as a matter of law constitute partiality when the complaining party had the means to discover the adverse relationship. The concurrence cites three cases from the Second Circuit Court of Appeals for support. These cases reason that the undisclosed relationship was waived either because it was well-known to the complaining party, easily discoverable or rendered trivial by the arbitrator's other disclosures. *See Cook Indus., Inc. v. C. Itoh & Co.*, 449 F.2d 106, 107 (2nd Cir.1971) (party aware of undisclosed relationship); *see also Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 701, 702 (2nd Cir.1978) (failure to disclose trivial in light of relationship and other disclosures); *Garfield & Co. v. Wiest*, 432 F.2d 849, 853–54 (2nd Cir.1970) (waiver). The summary judgment evidence, however, does not suggest what means the Bossleys had to discover this relationship, and thus these cases are no more controlling here than our decision in *TUCO*.

In *TUCO*, the complaining party did not know about the arbitrator's undisclosed relationship. Thus, the relationship was un-

known in the sense that it was neither open, obvious, nor easily discoverable by the complaining party. *TUCO*, 960 S.W.2d at 631. In *Cook Industries*, on the other hand, the undisclosed relationship—that the arbitrator's employer had done substantial business with the winning party— was well-known because the employer was the largest United States company in a closely knit trading group and thus had done substantial business with both parties to the arbitration in the ordinary course of business, a fact the court concluded as a matter of law the complaining party knew. *Cook Indus.*, 449 F.2d at 108. *TUCO* and these "common knowledge" cases are thus on opposite ends of the evidentiary spectrum. Where this case falls along that spectrum we simply do not know based on the facts presented. The relationship that existed between Asmar and Nettles was not open and obvious, nor was it a matter of common knowledge. It did not arise from a community of business interests shared by all participants in the arbitration. But neither was it a relationship that could not have been discovered. Thus, neither *Cook's* attribution of knowledge to the complaining party nor *TUCO's* attribution of partiality to the arbitrator is appropriate on the limited facts presented here.

Although the record is silent about why Nettles did not disclose his relationship with Asmar, the concurring justices presume the missing facts. They presume that Nettles remembered Asmar but did not disclose the relationship because he reasonably believed that Asmar also remembered him and disclosed their history to the Bossleys. The concurrence posits no other reason for Nettles's silence, and is untroubled by the contrary summary judgment evidence. While we, too, could postulate reasons for Nettles's silence, our summary judgment standard simply does not permit such speculation. As the Elev-

enth Circuit Court of Appeals has observed:

> the "evident partiality" question necessarily entails a fact intensive inquiry. This is one area of the law which is highly dependent on the unique factual settings of each particular case. The black letter rules of law are sparse and analogous case law is difficult to locate.

*Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 435 (11th Cir.1995).

The concurrence strains to find a waiver under the Second Circuit Court of Appeals' rationale in *Cook Industries* and *Garfield*, but that court has itself declined to extend those cases beyond their limited facts. *See Sanko S.S. Co., Ltd. v. Cook Indus., Inc.*, 495 F.2d 1260, 1265 (2nd Cir. 1973) ("Unlike the *Garfield* and *Cook* cases, the record in the present case, as it now stands, does not justify [the assumption that the undisclosed relationship was known to all parties]."). In *Sanko*, the trial court stated that it would forego an evidentiary hearing and accept Sanko's version of contested facts regarding the arbitrator's prior dealings with the opposing party. Nevertheless, the trial court made findings at variance with Sanko's position and concluded that the arbitration award should not be vacated. The court of appeals reversed and remanded, concluding that an evidentiary hearing was necessary to determine the full extent and nature of the relationships at issue. *Id.* at 1263. The court distinguished *Garfield* and *Cook* because there was no conclusive evidence that Sanko either knew or should have known of the extent of the relationship in question. *Id.* at 1265.

Like the trial court did in *Sanko*, the concurrence here seeks to presume facts with no evidentiary basis. Acknowledging that it would not be reasonable to expect the Bossleys to research court records to determine whether Nettles had ever been

sued and, if so, who had testified against him, the concurrence would nonetheless excuse Nettles's nondisclosure on the ground that he could presume the Bossleys knew about the prior adverse relationship because Asmar should have remembered it. Thus, the concurrence would excuse even an arbitrator's knowing concealment of a relationship evidencing partiality as long as there are facts from which the arbitrator can presume the complaining party knew it too. But the whole purpose of an arbitrator's duty to disclose is to avoid this very type of speculative presumption and let the parties to the arbitration make the call.

█ It is well-established, and the concurring justices acknowledge, that "a neutral arbitrator has a duty to disclose dealings of which he or she is aware 'that might create an impression of possible bias.'" 79 S.W.3d at 37 (quoting Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145, 149, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968)). The arbitration agreement here further incorporates the NASD Code, which provides not only that arbitrators should disclose relationships that "might reasonably create an appearance of partiality or bias," but also that they should make a "reasonable effort" to inform themselves of such relationships. NASD CODE OF ARBITRATION PROCEDURE § 10312(a)-(b). Thus, there is no justification for the concurrence to shift the burden of disclosure from the arbitrator to a party.

### IV

We conclude that Mariner and Moore failed to establish as a matter of law that Nettles was not evidently partial. Although the Bossleys bear the ultimate burden of proving the arbitrator's partiality, on summary judgment Mariner and Moore assumed the burden to prove that no fact issue exists. Because they did not meet this burden, we affirm the court of appeals' judgment.

Justice OWEN issued a concurring opinion, in which Chief Justice PHILLIPS, Justice HECHT, and Justice JEFFERSON joined.

Justice OWEN, joined by Chief Justice PHILLIPS, Justice HECHT, and Justice JEFFERSON, concurring.

The aspect of this case that has troubled me from the outset is that the Bossleys' position is inconsistent. They say that their expert witness Asmar's testimony against Nettles in a legal malpractice suit was so critical of him that he could not thereafter be an impartial arbitrator in a case in which Asmar testified. But the Bossleys also say that Asmar's testimony against Nettles was not significant enough for her to recall even though she knew for seven months before the arbitration hearing that Nettles would be one of the arbitrators, and she was present during a significant portion of the arbitration hearing at which he presided.

The Court says that whether Nettles was evidently partial should be resolved by a subjective test—what he knew and when he knew it. I would apply an objective test, as we did in TUCO,[1] to determine evident partiality. The test should be whether an arbitrator could reasonably believe that the undisclosed facts were known to the party seeking to set aside the arbitration award.

An arbitration award should not be vacated for "evident partiality" based solely on a failure to disclose if the party seeking to vacate the award could reasonably have been expected to know the undisclosed

---

1. *Burlington N. R.R. Co. v. TUCO, Inc.*, 960 S.W.2d 629, 636 (Tex.1997).

facts. As we explained in *TUCO*, when "evident partiality" is based on a failure to disclose, it is the failure to disclose itself that establishes evident partiality because the arbitrator has given the impression that he or she has concealed material facts not otherwise available to a party to the arbitration that might reasonably affect the arbitrator's partiality.[2] In a case like the one before us today, there cannot be an impression that the arbitrator concealed material information because the arbitrator could not reasonably count on the expert witness's memory to fail.

These principles are not the basis for "waiver." They are a framework for determining when nondisclosure in and of itself constitutes evident partiality. There could be waiver of evident partiality based on nondisclosure if the complaining party knew all the facts before the arbitration concluded and did not complain. But whether there was evident partiality is a threshold, distinct issue. What the losing party to an arbitration knew or should have known does not answer the question of whether an arbitrator's nondisclosure exhibits evident partiality. An analysis of evident partiality in cases such as this should focus on what the arbitrator could reasonably have believed the losing party knew.

There are two other issues raised in this case. One is, did the parties' agreement to arbitrate under the National Association of Securities Dealers (NASD) Code of Arbitration enlarge the grounds for vacating an arbitration award under the Federal Arbitration Act?[3] I would answer that question "no." Assuming, without deciding, that parties can contractually enlarge the standard of review under the FAA, neither the parties' agreement nor the NASD Code says that failure to comply with the NASD Code's disclosure requirements or its duty to investigate is a ground for vacating the arbitration award. Even the courts that have held or indicated that parties may expand the standard of review under section 10(a) of the FAA have required that the parties' intent to do so be clearly expressed in their agreement.[4] The NASD Code does not specify any consequence for failure to comply with its disclosure and investigation requirements after the arbitration is concluded. Accordingly, any violation of the NASD Code must be judged by the FAA's standards for vacatur. Failure to comply with the NASD Code is not a basis for setting aside an award under the FAA unless that failure to comply independently establishes "evident partiality" or one of the other grounds for vacating an award specified in the federal arbitration statute. As already discussed above, a failure to disclose facts that an arbitrator could reasonably believe were known to the party seeking to set aside the arbitration cannot be "evident partiality."

The final issue is whether a breach of the NASD Code's requirement that potential arbitrators "make a reasonable effort to inform themselves" of certain interests or relationships would, in and of itself, constitute evident partiality under the FAA. I would again hold "no." There certainly would be circumstances in which a court should find "evident partiality" from an arbitrator's failure to make a reasonable effort to inform himself or herself about certain relationships that were un-

---

2. *Id.* at 636.

3. 9 U.S.C. § 10(a).

4. *See, e.g., Roadway Package Sys., Inc. v. Kayser,* 257 F.3d 287 (3d Cir.2001); *UHC Mgmt. Co., Inc. v. Computer Sciences Corp.,* 148 F.3d 992 (8th Cir.1998); *LaPine Tech. Corp. v. Kyocera Corp.,* 130 F.3d 884 (9th Cir.1997); *Gateway Techs., Inc. v. MCI Telecomms. Corp.,* 64 F.3d 993 (5th Cir.1995).

known to the party seeking to set aside an arbitration award. Some examples are considered below. But under the circumstances of this case, evident partiality would not be established if Nettles failed to contact his legal counsel in the malpractice suit against him or to review his personal files regarding that litigation to identify witnesses who may have testified against him. A "reasonable effort to inform" oneself would not require review of every matter in which a lawyer or witness may have been adverse to or critical of the potential arbitrator.

However, I agree that this case should be remanded to the trial court. It has come to us on summary judgment. Aside from alleging evident partiality based on Nettles' failure to disclose, the Bossleys alleged that Nettles engaged in misconduct or was evidently partial because he excluded certain pieces of evidence and limited cross-examination. Mariner and Moore did not address these allegations in their motion for summary judgment. They did not establish as a matter of law that Nettles was not evidently partial or that he did not engage in misconduct. Accordingly, I concur in the Court's judgment remanding this case to the trial court for further proceedings.

## I

It is well settled that a neutral arbitrator has a duty to disclose dealings of which he or she is aware "that might create an impression of possible bias."[5] This Court followed the United States Supreme Court's decision in *Commonwealth Coatings* when we construed the Texas arbitra-

tion statute's requirement that an arbitration award must be vacated "if there has been 'evident partiality by an arbitrator appointed as a neutral.'"[6] But in both *Commonwealth Coatings* and *TUCO,* the facts that were not disclosed were known to the arbitrator but unavailable to the party seeking to set aside the arbitration. In the case before us today, a very different issue is presented. Should an arbitration award be set aside if the potential arbitrator fails to disclose material facts that he or she could reasonably have believed were known to the party seeking to vacate an award?

My analysis does not turn, as the Court asserts, on improperly presuming facts. The record must be viewed in the light most favorable to the Bossleys, who were the nonmovants,[7] and we resolve all doubts against Mariner and Moore, the movants.[8] The record is silent on whether Nettles knew who Asmar was. I therefore assume, as we must under the state of the record and our summary judgment standard, that Nettles actually knew that Asmar testified against him and that he recalled this fact before the arbitration award was issued. The difference between my approach to this case and the Court's is that I believe evident partiality should be measured by an objective test. The Court concludes otherwise. The Court's result is that if Nettles knew about Asmar's testimony, then he must have been evidently partial. I do not believe that an arbitrator's actual knowledge should be determinative when he or she could reasonably believe that the undis-

---

**5.** *Commonwealth Coatings Corp. v. Continental Cas. Co.,* 393 U.S. 145, 149, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968).

**6.** *Burlington N. R.R. Co. v. TUCO, Inc.,* 960 S.W.2d 629, 629–30 (Tex.1997) (quoting Tex. Civ. Prac. & Rem.Code § 171.014).

**7.** *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 197 (Tex.2002).

**8.** *Shah v. Moss,* 67 S.W.3d 836, 842 (Tex. 2001).

closed facts were already known to the party challenging the award.

Federal court decisions have recognized that as a practical matter, an arbitrator's disclosure obligation must be limited to facts or dealings about which the parties cannot reasonably be expected to be aware. The United States Court of Appeals for the Second Circuit has said:

> [W]hile the Supreme Court in *Commonwealth Coatings* emphasized the importance of an arbitrator disclosing "to the parties any dealings that might create an impression of possible bias," this court, in giving practical meaning to that principle, has treated the obligation to which arbitrators are subject as being to disclose dealings of which the parties cannot reasonably be expected to be aware, i.e., dealings "not in the ordinary course of business." [9]

That court later said in *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*: "We emphasized [in *Cook Industries* ] that we have given 'practical meaning' to the *Commonwealth Coatings* principle of disclosure by treating 'the obligation to which arbitrators are subject as being to disclose dealings of which the parties cannot reasonably be expected to be aware.' " [10]

This articulation of an arbitrator's duty is simply the application of common sense. Improper motives cannot be attributed to someone who fails to disclose facts that he or she could reasonably expect those with whom they were dealing to know.

The facts in *Cook Industries, Inc. v. C. Itoh & Co.,* are instructive.[11] The losing party, Cook Industries, complained that one of the arbitrators did not disclose that his employer, Cargill, had extensive business dealings with Itoh, the party who won the arbitration. Although many of the facts about the arbitrator's relationship with Cargill and Itoh were in dispute at the hearing on Cook's motion to vacate the award, there was evidence that Cargill sold approximately $50,000,000 of grain to Itoh in a single year.[12] Itoh was Cargill's most important grain customer in Japan, and an affidavit indicated that the arbitrator personally handled 95% of Cargill's sales to Japan.[13] The affidavit also said that the arbitrator's performance at Cargill was judged by those sales in Japan.[14] The Second Circuit was unpersuaded that this constituted any evidence of evident partiality. It held that the district court was justified in concluding that Cook was aware of a relationship between Cargill and Itoh.[15] The Second Circuit said one basis for its conclusion was that many of Cook's employees were former employees of Cargill and knew that there had been dealings. Another was that there were relatively few corn dealers and that Cargill had done business with the losing party in the arbitration as well as Itoh. The circuit court pointedly noted that it found "nothing in the record which suggests the existence of any extraordinary secret deal[ings]" between Itoh, who was the prevailing party, and the arbitrator's employ-

---

9.  *Cook Indus., Inc. v. C. Itoh & Co.,* 449 F.2d 106, 108 (2d Cir.1971) (quoting *Commonwealth Coatings Corp. v. Continental Cas. Co.,* 393 U.S. 145, 149, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968) (citation omitted)). *See also Garfield & Co. v. Wiest,* 432 F.2d 849, 854 (2d Cir.1970).

10.  579 F.2d 691, 700 (2d Cir.1978) (quoting *Cook Indus.,* 449 F.2d at 108).

11.  449 F.2d 106 (2d Cir.1971).

12.  *Id.* at 108 (Oakes, J., dissenting).

13.  *Id.*

14.  *Id.*

15.  *Id.* at 107.

er, Cargill.[16] The case did not turn, as the Court suggests, on "common knowledge" in the industry. The losing party had access to enough facts to put it on inquiry about the arbitrator's specific role in Cargill's dealings with Itoh. It was not permitted to complain that it did not learn of those more specific facts until after the arbitration award.

In the case before the Court today, Asmar's testimony against Nettles in another suit was not an "extraordinary secret." Asmar most certainly had actual knowledge of her role in the malpractice suit against Nettles, even if for a time her memory failed. Nettles cannot be faulted for "evident partiality" because he failed to disclose something that he could reasonably have believed was known to Asmar and those who hired her as their only expert and principal witness in the arbitration.

The Second Circuit's decision in *Andros* focused more directly on what a reasonable arbitrator could expect the complaining party to know.[17] In that case, Marc Rich & Co. was the losing party in an arbitration and thereafter investigated the neutral arbitrator's prior service. Based on that investigation, Marc Rich moved to vacate the award and offered an affidavit to the trial court that showed that the prevailing party's non-neutral arbitrator, Nelson, had participated in appointing the neutral arbitrator, Arnold, as a neutral arbitrator in nineteen other arbitrations. In each of those nineteen cases, Arnold voted the same way as Nelson. The trial court refused to vacate the award. On appeal Marc Rich complained that it had not been given an adequate opportunity to show why the arbitration award should be set aside. The Second Circuit observed that at first blush, Marc Rich's request "seem[ed] reasonable, particularly in light of the broad discovery usually allowed in the federal courts."[18] But it nevertheless upheld the district court's confirmation of the arbitration award without further proceedings. The circuit court articulated three grounds for doing so. First, it reiterated its holding in *Cook*[19] that an arbitrator is only required to disclose " 'dealings of which the parties cannot reasonably be expected to be aware.' "[20] Second, it did not regard the undisclosed information "as the sort of information an arbitrator would reasonably regard as creating an impression of possible bias."[21] Third, the Second Circuit concluded that Arnold's and Nelson's "service together on arbitration panels was no secret" since Marc Rich was able to obtain this information after " 'an exhaustive review of approximately 1200 published awards of the Society of Maritime Arbitrators.' "[22] Marc Rich, the court said, "could have made such a review just as easily before or during the arbitration rather than after it lost its case."[23]

In the case before us today, it would not be reasonable to expect the Bossleys to comb court records to find out if Nettles had ever been sued and if so, who testified against him. But it would not be unreasonable to expect that the Bossleys' chief,

---

16. *Id.* at 108.

17. *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.,* 579 F.2d 691 (2d Cir.1978).

18. *Id.* at 697.

19. 449 F.2d at 108.

20. 579 F.2d at 700 (quoting *Cook,* 449 F.2d at 108).

21. *Id.* at 701.

22. *Id.* at 702.

23. *Id.*

and paid, witness, Asmar, would remember that she testified as a hired, expert witness against Nettles in a legal malpractice suit that the Bossleys say involved hundreds of thousands of dollars. The fact that Asmar had a lapse of memory during the pendency of the arbitration does not raise a fact question under the objective standard by which nondisclosure should be judged in deciding if an arbitration award must be vacated for evident partiality. That objective standard is whether the arbitrator could reasonably believe that the losing party already knew the facts that were not disclosed.

The recognition in *Cook* and *Andros* that "evident partiality" must involve matters about which the complaining party could not reasonably be expected to be aware comports with our rationale in *TUCO*. In *TUCO*, the arbitrator knew that three weeks before the arbitration hearing began, his law firm had received referral of a substantial matter from the law firm of his co-arbitrator. We did not set aside the arbitration award because of the referral but because the arbitrator failed to disclose a material matter about which the parties to the arbitration could not reasonably be expected to know. We said in *TUCO*: "We emphasize that ... evident partiality is established from the *nondisclosure itself*, regardless of whether the nondisclosed information necessarily establishes partiality or bias." [24] An impression had been created that the arbitrator knowingly failed to disclose material facts unknown to the parties. But that is not the case here.

Assuming, as we are required to assume under our summary judgment standard, that Nettles *knowingly* failed to disclose Asmar's testimony against him, it cannot be said that a reasonable arbitrator in Nettles' position would have believed that the undisclosed facts were unknown to the Bossleys. A reasonable potential arbitrator could have concluded that the Bossleys were aware of Asmar's role in the malpractice case. Indeed, it would have been unreasonable for an arbitrator in Nettles' shoes to believe that the Bossleys did not know about Asmar's prior testimony if he in fact desired to conceal that information.

The Bossleys knew for seven months after they designated Laila Asmar as their only witness on securities matters that Nettles was going to be the neutral arbitrator. Asmar was present at the hearing when the arbitration panel, including Nettles, was sworn in. She was present when, before the hearing began, the NASD representative asked the Bossleys and Mariner to state any objections they might have to the panel. Nettles would have been foolish to count on Asmar's memory to fail if he were attempting to conceal her prior testimony against him. It would be unreasonable to attribute Nettles' silence to a desire to mask ill will he might have toward Asmar. Under these circumstances, there can be no objectively reasonable impression that Nettles' failure to disclose exhibited "evident partiality."

The rationale of *Cook* and *Andros* has not been undercut or "limited" by the Second Circuit's decision in *Sanko S.S. Co., Ltd. v. Cook Industries, Inc.,*[25] as the Court suggests. Based on the facts in *Sanko*, the Second Circuit focused on what the losing party knew or should have known rather than what the neutral arbitrator could reasonably have believed the losing party knew. Sanko, the losing party in the arbitration, contended that the neutral arbitrator was not forthcoming

---

**24.** *TUCO,* 960 S.W.2d at 636 (emphasis in original).

**25.** 495 F.2d 1260 (2d Cir.1973).

when he said that the company of which he was president had dealings with Cook " 'of a spot nature' " when in fact, his company was a subsidiary of a company that arranged " 'swaps' and 'sales' from time to time running into the millions of dollars." [26] The arbitrator also failed to disclose that the prevailing party's attorney also represented the arbitrator's company and that previously, when this attorney had left his former firm, the arbitrator's company moved its business from that firm in order to continue to employ this same lawyer.[27] The Second Circuit held that these "discrepancies" required a remand for an evidentiary hearing.[28] The court noted that Sanko and Cook were not "members of a single closely-knit trading group," and more importantly, that Sanko's officers *and agents* denied in affidavits having *any* knowledge of the arbitrator's contacts with Cook or its attorney.[29] Given these facts, the Second Circuit held that under *Commonwealth Coatings*, the arbitrator had a duty to disclose. The Second Circuit did not focus on what the arbitrator could reasonably expect the losing party to know, but that does not mean that it would not do so if it were faced with facts like those before our Court today. All that can be said of *Sanko* is that the Second Circuit would uphold an arbitration award if the losing party "knew or should reasonably have known" or "did, in fact, know or have reason to know" of the undisclosed dealings.[30]

There is a distinction between focusing on what an arbitrator could reasonably believe and focusing on what the losing party knew or should have known, but it is important to give effect to both concepts in

deciding whether to vacate an arbitration award for nondisclosure. As an example, suppose that Nettles and Asmar were at one time married to one another and had a very contentious divorce. Counsel for Mariner knew this, but counsel for the Bossleys and the Bossleys themselves did not. Nettles did not disclose this information and neither did Asmar. The Bossleys did not learn of the relationship until after the arbitrators issued their decision. Could the Bossleys set aside the award based solely on Nettles' nondisclosure? If the only inquiry were whether the Bossleys knew or reasonably should have known of the marriage and divorce, the answer would be yes, they could set aside the award. Judged from the Bossleys' standpoint, they did not know the facts, and it cannot be said that they reasonably should have known. But there should be another inquiry in deciding whether Nettles was evidently partial based solely on his nondisclosure. An arbitrator in Nettles' position could reasonably have believed that his former wife had disclosed their relationship to the parties who had retained her or their counsel. An arbitrator in these circumstances could not have reasonably believed that he was concealing material information. Therefore, it cannot be said that he was evidently partial, and the award should not be vacated.

The Court does not seem to grasp these distinctions. It characterizes my position as saying that "an arbitrator's failure to disclose an adverse relationship cannot as a matter of law constitute partiality when the complaining party had the means to discover the adverse relationship." [31] But my analysis does not depend on whether

26. *Id.* at 1262.

27. *Id.*

28. *Id.* at 1263.

29. *Id.* at 1265.

30. *Id.*

31. 79 S.W.3d at 33.

the losing party had "the means" to learn the facts but on whether the arbitrator could reasonably have believed that the facts were known to the losing party. Similarly, the Court says that I find a "waiver." [32] But, as I have explained, although there would be a waiver if the Bossleys knew of Asmar's past testimony, that is unrelated to the question of whether a failure to disclose is evident partiality. And finally, the Court says that my analysis depends on what "Asmar should have remembered." [33] Again, the inquiry is whether the nondisclosure, in and of itself, shows evident partiality. The precise question in this case is whether an arbitrator could reasonably believe that Asmar had informed the Bossleys of her testimony against Nettles, not whether Asmar "should have remembered."

In the case before us, Asmar knew at one time and certainly had reason to know that she had testified against Nettles. But she says that she did not actually remember. Given this evidence, I agree with the Court that Mariner did not establish as a matter of law that the Bossleys knew or should have known that Asmar testified against Nettles. But that should not be the end of the inquiry. The fact that Nettles did not disclose this past relationship when he was being considered as an arbitrator is not evidence of evident partiality, even if Nettles had actual knowledge when he signed on as an arbitrator that Asmar had testified against him. That is because an arbitrator in Nettles' position could not reasonably believe that he was concealing material information. An arbitrator could reasonably expect that the expert witness would communicate the facts to her clients or their counsel.

## II

The parties in this case agreed to conduct arbitration proceedings under the NASD Code, which requires potential arbitrators to "make a reasonable effort to inform themselves" of certain interests or relationships enumerated elsewhere in the Code. Obviously, if Nettles' failure to disclose that Asmar testified against him is not evident partiality even if he had actual knowledge of that fact, any failure on his part to make a reasonable effort to inform himself about past dealings with Asmar similarly cannot establish evident partiality. Any failure to disclose facts that he would have discovered would not show evident partiality if those facts could have been communicated by Asmar to the Bossleys. Again, it is not "evidently partial" to fail to tell someone facts that you can reasonably assume that they know. Accordingly, I would hold that any failure by Nettles to "make a reasonable effort to inform" himself [34] about past dealings with Asmar cannot rise to the level of "evident partiality" under the FAA.

The Court seems to agree with me on this point, at least at one juncture in its opinion. It says, "Clearly, the relationship could not have influenced Nettles' partiality if, in fact, he was unaware of it during the arbitration." [35] The Court correctly discerns that an impression of partiality cannot be created simply by the existence of facts, unknown to the arbitrator, that the arbitrator's "reasonable effort to inform [him]sel[f]" would have revealed. Yet, there is some inconsistency in the Court's opinion on this point. Near the end of its opinion, the Court says in a single sentence, "[t]he arbitration agree-

---

32.  *Id.* at 33.

33.  *Id.* at 35.

34.  NASD CODE OF ARBITRATION PROCEDURE § 10312(b).

35.  79 S.W.3d at 40.

ment here further incorporates the NASD Code, which provides not only that arbitrators should disclose relationships that 'might reasonably create an appearance of partiality or bias,' but also that they should make a 'reasonable effort' to inform themselves of such relationships." [36] The Court does not elaborate. We are left to wonder whether the Court would set aside the award if Nettles did not actually know that Asmar had testified against him, but Nettles did not make any effort to determine whether he had a past connection with Asmar.

### III

The Bossleys contend that because the arbitration agreement provides that the NASD Code applies, the award must be set aside if Nettles did not comply with that Code's investigation and disclosure requirements. If Nettles had actual knowledge that Asmar testified against him, or if a reasonable investigation by Nettles would have revealed his past dealings with Asmar, the Bossleys argue, then the award must be vacated because he did not disclose those dealings. The contract should govern, the Bossleys contend, and failure to comply requires vacatur. As noted above, the Court does not offer any guidance on this issue.

It is not at all clear whether parties can, by their agreement, expand the standards for judicial review of arbitration awards that are specified in section 10(a) of the FAA. The United States Supreme Court has not resolved that question, and there is a split among the circuit courts. There are two decisions of the United States Supreme Court that are at least instructive, however.

The most recent is *Mastrobuono v. Shearson Lehman Hutton, Inc.*[37] The arbitration agreement in that case was subject to the FAA, but the agreement said that it would be governed by the laws of New York and also, that the arbitration would be conducted in accordance with the NASD rules. The arbitration panel awarded punitive damages. New York law allowed courts, but not arbitrators, to award punitive damages. The United States Supreme Court held that the parties' agreement would govern whether punitive damages could be recovered, not state law. It then concluded that there was tension between the choice-of-law provision specifying New York law and the provision referring to NASD rules that created an ambiguity about whether the parties' agreement allowed punitive damages. The NASD Code allowed " 'damages and other relief' " and, therefore, "at least ... contemplate[d]" punitive damages, the Court reasoned, and an NASD manual given to arbitrators said that arbitrators could " 'consider punitive damages as a remedy,' " the Court noted.[38] Ambiguities, the Court said, are resolved in favor of arbitration, and further, the Court said, it was unlikely that petitioners contemplated that they were giving up the right to recover punitive damages by agreeing to the choice-of-law provision. The Court "harmonized" the contract provisions to "encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators." [39]

The Supreme Court quoted extensively from its earlier decision in *Volt Information Sciences, Inc. v. Board of Trustees of*

---

36. 79 S.W.3d at 42.

37. 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995).

38. *Id.* at 61, 115 S.Ct. 1212.

39. *Id.* at 63–64, 115 S.Ct. 1212.

*Leland Stanford Junior University.*[40] The Court held in *Volt* that even though the arbitration agreement was subject to the FAA, the Court would give effect to the parties' agreement that California law governed to the extent that California law did not "undermine the goals and policies of the FAA."[41] California law allowed courts to stay arbitration proceedings pending resolution of related litigation between a party to the arbitration agreement and third parties not bound by it when there was a possibility of conflicting rulings on common issues of law or fact.[42] The Court said in *Volt* that "the FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that 'arbitration proceed *in the manner provided for in [the parties'] agreement.*' "[43] The Court elaborated that although the FAA preempts state laws that require a judicial forum when parties had agreed to arbitrate,

> it does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself. Indeed, such a result would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under

which that arbitration will be conducted. Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward. By permitting the courts to "rigorously enforce" such agreements according to their terms, we give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind by [sic] the FAA.[44]

At least three United States Courts of Appeals have concluded, based on the foregoing reasoning in *Mastrobuono* and *Volt,* that parties can, by contract, add to the grounds for vacating an arbitration award under section 10(a) of the FAA. The seminal case is the Fifth Circuit's decision in *Gateway Technologies, Inc. v. MCI Telecommunications Corp.,* which held that courts must give effect to an agreement that said " '[t]he arbitration decision shall be final and binding on both parties, except that errors of law shall be subject to appeal.' "[45] The Ninth Circuit found *Gateway* persuasive and gave effect to the parties' agreement that: " 'The Court shall vacate, modify or correct any award: (i) based upon any of the grounds referred to in the Federal Arbitration Act, (ii) where the arbitrators' findings of fact are not supported by substantial evidence, or (iii) where the arbitrators' conclusions of law

---

**40.** 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

**41.** *Id.* at 478, 109 S.Ct. 1248.

**42.** *Id.* at 471, 109 S.Ct. 1248.

**43.** *Id.* at 474–75, 109 S.Ct. 1248 (quoting 9 U.S.C. § 4 (emphasis in *Volt* )).

**44.** *Id.* at 479, 109 S.Ct. 1248 (citations omitted).

**45.** 64 F.3d 993, 996 (5th Cir.1995) (emphasis omitted).

are erroneous.' "[46] The Third Circuit followed suit, holding that contracting parties could "opt out of the FAA's default vacatur standards and fashion their own,"[47] but that a choice of law provision selecting Pennsylvania law and a provision agreeing to arbitrate under the Commercial Arbitration Rules of the American Arbitration Association did not "opt out" of the FAA's standards.[48]

At least four other circuit courts have reached a different conclusion, holding or indicating that parties cannot expand the grounds for vacatur under the FAA. The Tenth Circuit expressly declined to follow *Gateway* and *Lapine* in *Bowen v. Amoco Pipeline Co.*[49] It refused to give effect to the parties' agreement that they would have a right to appeal " 'on the grounds that the award is not supported by the evidence.' "[50] The Tenth Circuit saw a distinction between allowing parties to compel the arbitration itself in accordance with the terms of their agreement and requiring courts to follow their agreement regarding the grounds on which an award could be vacated. Section 4 of the FAA, the court said, expressly allows parties to compel arbitration " 'in the manner provided for in [the] arbitration agreement,' " but, the court observed, section 10 of the FAA, setting forth the grounds for vacating an award, does not contain any language requiring courts to follow the parties' agreement.[51]

The Seventh Circuit held in *Merit Insurance Co. v. Leatherby Insurance Co.*, that if the losing party "is to get the

arbitration award set aside it must bring itself within the [FAA]. The statute specifies limited grounds for setting aside an arbitration award."[52] The court held that "even if the [arbitrator's] failure to disclose was a material violation of the ethical standards applicable to arbitration proceedings, it does not follow that the arbitration award may be nullified judicially."[53] Judge Posner, writing for the court in *Merit*, explained the basis for the holding:

> Although we have great respect for the Commercial Arbitration Rules and the Code of Ethics for Arbitrators, they are not the proper starting point for an inquiry into an award's validity under section 10 of the United States Arbitration Act .... The arbitration rules and code do not have the force of law.... [T]o get the arbitration award set aside [the aggrieved party] must bring itself within the statute .... The statute specifies limited grounds for setting aside an arbitration award.
>
> \* \* \*
>
> The American Arbitration Association ... may set its standards as high or low as it thinks its customers want. The statute has a different purpose—to make arbitration effective by putting the coercive force of the federal courts behind arbitration decrees that affect interstate commerce or are otherwise of federal concern.... The standards for judicial intervention are therefore narrowly drawn to assure the basic integrity of the arbitration process without meddling in it.... The fact that the AAA went beyond the statutory stan-

---

**46.** *LaPine Tech. Corp. v. Kyocera Corp.*, 130 F.3d 884, 887, 889 (9th Cir.1997).

**47.** *Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 288 (3d Cir.2001).

**48.** *Id.* at 293.

**49.** 254 F.3d 925 (10th Cir.2001).

**50.** *Id.* at 930, 933.

**51.** *Id.* at 935.

**52.** 714 F.2d 673, 680–81 (7th Cir.1983).

**53.** *Id.* at 680.

dards in drafting its own code of ethics does not lower the threshold for judicial intervention.[54]

Subsequently, in *Chicago Typographical Union v. Chicago Sun–Times, Inc.*, the Seventh Circuit said: "If the parties want, they can contract for an appellate arbitration panel to review the arbitrator's award. But they cannot contract *for judicial* review of that award; federal jurisdiction cannot be created by contract." [55]

The United States Court of Appeals for the Fourth Circuit has also concluded that an agreement to conduct an arbitration under ethical rules adopted by arbitration providers cannot be the basis for setting aside an award under the FAA.[56] It is the arbitration statute that governs, the court said:

> Even if [the arbitrator]'s failure to disclose had violated Rule 19 [requiring disclosure to the AAA of any circumstance likely to affect impartiality], that would not, by itself, require or even permit a court to nullify an arbitration award. When parties agree to be bound by the AAA rules, those rules do not give a federal court license to vacate an award on grounds other than those set forth in [the federal statute]. Thus, although the AAA rules provide significant and helpful regulation of the arbitration process, they "are not the proper starting point for an inquiry into an award's validity." *Merit*, 714 F.2d at 677. Rather, in determining whether to set aside an arbitration award, a court may only consider whether the complaining party has demonstrated a violation of the governing statute. The material and relevant facts an arbitrator fails to disclose may demonstrate his "evident partiality" under [the federal act]. However, non-disclosure, even of such facts, has no independent legal significance and does not in itself constitute grounds for vacating an award.[57]

A more recent decision is that of the Eighth Circuit in *Delta Mine Holding Co. v. AFC Coal Properties, Inc.*[58] Although the parties had agreed that their arbitration proceeding must comply with the rules of the American Arbitration Association, the court held that "arbitration rules and ethical codes 'do not have the force of law.'" [59] The court said that a reviewing court must "focus exclusively on [the] statutory grounds" in deciding whether the arbitrator's conduct required the arbitration award to be set aside.[60]

The Eighth Circuit has also said in *UHC Management Company, Inc. v. Computer Sciences Corp.*, "[i]t is not clear, however, that parties have any say in how a federal court will review an arbitration award when Congress has ordained a specific, self-limiting procedure for how such a review is to occur." [61] The court observed that "[s]ection 9 of the FAA provides that federal courts 'must grant' an order confirming an arbitration award 'unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.'" [62] The court continued, "Congress did not authorize *de novo* review of such an award on its merits; it commanded that

---

54. *Id.* at 680–81 (citations omitted).

55. 935 F.2d 1501, 1505 (7th Cir.1991).

56. *ANR Coal Co. v. Cogentrix of N. Carolina, Inc.*, 173 F.3d 493, 499 (4th Cir.1999).

57. *Id.* (citation omitted).

58. 280 F.3d 815 (8th Cir.2001).

59. *Id.* at 820.

60. *Id.*

61. 148 F.3d 992, 997 (8th Cir.1998).

62. *Id.*

when the exceptions do not apply, a federal court has no choice but to confirm." [63]

There are good arguments on both sides of the question of whether parties can by agreement add to the statutory grounds for setting aside an arbitration award. But I need not decide in this case which is the proper interpretation of the FAA. Even those courts that have held that parties may expand the scope of judicial review by agreement have said that any such agreement must be explicit.[64] The arbitration agreement in the case before us today does not say that a violation of the NASD Code is grounds for vacatur. Nor does the NASD Code say that a breach of its provisions is grounds for vacatur. There is, therefore, no basis for applying any standards other than those set forth in section 10(a) of the FAA in determining whether the award in this case must be set aside. Nor is there any basis for concluding that an arbitrator's failure to "make a reasonable effort to inform [himself or herself]" of potential conflicts or of past dealings with parties or witnesses constitutes evidence of evident partiality in every case.

The circumstances in which the failure to conduct an investigation can constitute evident impartiality should be limited. For example, the Ninth Circuit in *Schmitz v. Zilveti*, posited that "parties can expect a lawyer/arbitrator to investigate and disclose conflicts he has with actual parties to the arbitration," and the fact "[t]hat the lawyer forgot to run a conflict check or had forgotten that he had previously represented the party is not an excuse." [65] I agree. It should be a simple matter for an attorney to conduct a conflicts check to see if she or her present firm has represented one of the parties. The failure to conduct such a simple check should be evidence of evident partiality. A lawyer might also be required to inquire of a spouse whether he or his firm represents or has represented one of the parties. But beyond these types of inquiries, a failure to investigate is more problematic. Should a lawyer be required to contact a former firm or firms and ask them to run conflicts checks and search files to see who was opposing counsel and who testified or else risk having any arbitration award in which the lawyer participates set aside? The answer should be no. Should an arbitrator be required to contact counsel in cases in which he or members of his firm have been sued to determine who the opposing counsel and witnesses were? Again, I think the answer must be no. To the extent that *Schmitz* could be read as requiring a broad investigation when rules such as the NASD Code require a "reasonable" inquiry, I disagree with that approach. The touchstone must be "evident partiality." Failure to conduct a broader search may breach a particular arbitration provider's rules for conducting arbitrations, but not every such breach amounts to evident partiality.

In *TUCO*, this Court expressly approved part of the reasoning in *Schmitz*, but we did not consider *Schmitz's* discussion of a duty to investigate that is imposed by the parties' agreement.[66] We did not consider in *TUCO* whether an arbitrator with no

---

63. *Id.*

64. *See Gateway Techs., Inc. v. MCI Telecomms. Corp.,* 64 F.3d 993 (5th Cir.1995); *LaPine Tech. Corp. v. Kyocera Corp.,* 130 F.3d 884 (9th Cir.1997); *Roadway Package Sys., Inc. v. Kayser,* 257 F.3d 287 (3d Cir.2001). *See also UHC Mgmt.,* 148 F.3d at 998 ("Assuming that it is possible to contract for expanded judicial review of an arbitration award, the parties' intent to do so must be clearly and unmistakably expressed.")

65. 20 F.3d 1043, 1048 (9th Cir.1994).

66. *TUCO,* 960 S.W.2d at 636.

actual knowledge of the undisclosed facts would exhibit "evident partiality" if he or she failed to conduct a reasonable investigation of past contacts to determine potential conflicts.

At least two courts have expressly rejected the proposition that an arbitrator's failure to investigate to determine a potential conflict can support a finding of evident partiality.[67] Both of those courts have held that an arbitrator's failure to disclose cannot be evident partiality unless he or she had actual knowledge of the undisclosed facts and that an arbitrator has no duty to investigate.[68] In *Gianelli*, the Eleventh Circuit relied on its prior decision in *Lifecare International, Inc. v. CD Medical, Inc.*,[69] in explaining that even if "the most routine background check by the arbitrator would have brought this information to light," the arbitrator had no "duty to investigate the past contacts to avoid evident partiality."[70]

The Court of Appeals for the District of Columbia Circuit has also expressly rejected a duty to investigate:

> [W]e hold that, nothing else appearing, the fact that an arbitrator has not conducted an investigation sufficient to uncover the existence of facts marginally disclosable under the *Commonwealth Coatings* duty is not sufficient to warrant vacating an arbitration award for evident partiality. That is, we explicitly hold that there is no duty on an arbitrator to make any such investigation.[71]

As I have said, I would not go as far as these courts. But any duty to investigate imposed by the parties' agreement cannot be the basis for vacating an award unless an arbitrator's failure to investigate in and of itself indicates that he or she has chosen to remain ignorant of conflicts that could easily be determined by inquiries that are considered routine.

\*   \*   \*   \*   \*   \*

For the foregoing reasons, I concur only in the judgment that is handed down today.

---

67. *Gianelli Money Purchase Plan & Trust v. ADM Investor Servs., Inc.*, 146 F.3d 1309, 1312 (11th Cir.1998); *Al–Harbi v. Citibank, N.A.*, 85 F.3d 680 (D.C.Cir.1996).

68. *Gianelli*, 146 F.3d at 1312; *Al–Harbi*, 85 F.3d at 682–83.

69. 68 F.3d 429 (11th Cir.1995).

70. *Gianelli*, 146 F.3d at 1312.

